MAYERS (FARRELL v.).  See Case No. 4,-685.

MAYFIELD (CLARKE v.).  See Case No. 2,-858.

---

## Case No. 9,345.

### The MAYFLOWER.

[1 Brown, Adm. 376; 5 Am. Law T. Rep. U. S. Cts. 367.] [1]

District Court, E. D. Michigan. April, 1872.

COLLISION — DAMAGES — DEMURRAGE BASED UPON PROBABLE EARNINGS.

1. In the absence of a market value for the use of vessels, the value of such use to the owner, in the business in which she was engaged at the time of the collision, is a proper basis for estimating damages for detention.

[Cited in The Belgenland, 36 Fed. 505; The Margaret J. Sanford, 37 Fed. 152.]

2. The books of the owner, showing previous and subsequent earnings, are competent evidence of the probable earnings during the detention.

[Cited in The Margaret J. Sanford, 37 Fed. 152.]

3. The party in fault should bear whatever inconvenience or hardship there may be in proving the exact amount of damages sustained.

4. In cases of conflicting testimony as to amounts, where the preponderance is not palpable, the finding of the commissioner will not be disturbed.

5. The services of an agent employed in settling and paying bills is not a proper item of damages.

6. Estimates of the cost of repairs, though competent in absence of better evidence, are not so where the repairs have been actually made.

---

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission. 5 Am. Law T. Rep. U. S. Cts. 367, contains only a partial report.]

On exceptions to commissioner's report of damages. The propeller Mayflower was adjudged to be in fault in a collision with the steamer Dove, and it was referred to a commissioner to ascertain the damages done to the Dove by the collision. [Case unreported.] The commissioner having made his report, both parties came in and excepted to it in several particulars.

H. B. Brown and W. A. Moore, for libellant.

The allowance of damages for detention is settled by repeated adjudications. 1 Pars. Shipp. 538; The Gazelle, 2 W. Rob. Adm. 279; Williamson v. Barrett, 13 How. [54 U. S.] 101; s. c., Barrett v. Williamson [Case No. 1,051]; Sturgis v. Clough, 1 Wall. [68 U. S.] 269; The Cayuga [Case No. 2,537]; Ralston v. The State Rights [Id. 11,540]; The Rhode Island [Id. 11,745]; Vantine v. The Lake [Id. 16,878]; Clarke v. The Fashion [Id. 2,851]; The Rhode Island [Id. 11,743]; The Narragansett [Id. 10,017]; The Apollon, 9 Wheat. [22 U. S.] 362, 377; McKnight v. Ratcliff, 44 Pa. St. 156; Jolly v. Terre Haute Co. [Case No. 7,441]; Lacour v. Mayor, etc., 3 Duer, 406; Marquart v. La Farge, 5 Duer, 559; St. John v. Mayor, etc., 6 Duer, 315; Borries v. Hutchinson, 18 C. B. (N. S.) 466a; Allison v. Chandler, 11 Mich. 542; Walter v. Post, 6 Duer. 363, 373; New Haven Steamboat & Transportation Co. v. Vanderbilt, 16 Conn. 420; Shelbyville, L. B. R. Co. v. Lewark, 4 Ind. 471; Sewall's Falls Bridge v. Fisk, 3 Fost. [N. H.] 171; Griffin v. Colver, 16 N. Y. 489; Wilkes v. Hungerford Market Co., 2 Bing. N. C. 287; The Empire State [Case No. 4,473]; The R. L. Mabey [Id. 11,-871]; The Santee [Id. 12,329]. Although the amount paid the Eighth Ohio seems large, yet if ordinary prudence was exercised in hiring her at this price, and the money was actually paid by the insurance company, libellant is entitled to recover it. To prove that each bill was reasonable might be impossible, and involve an endless number of issues. We are simply required to prove that we paid them in good faith, in the exercise of ordinary prudence, and without fraud or collusion. The Nebraska [Id. 10,-076]; The Thos. Kiley [Id. 13,924].

F. H. Canfield and G. V. N. Lothrop, for claimant.

The evidence does not justify the allowance of demurrage. No market value is shown for the use of such a vessel. The opinions of experts are not admissible, as they are based upon the probable earnings or profits. The Amiable Nancy, 3 Wheat. [16 U. S.] 546; Smyrna, L & P. Steamboat Co. v. Whilldin, 4 Har. [Del.] 228; The Clarence, 3 W. Rob. Adm. 283; Cummins v. Presley, 4 Har. [Del.] 315; Blanchard v. Ely, 21 Wend. 342; Boyd v. Brown, 17 Pick. 461; Benson v. Malden & M. Gaslight Co., 6 Allen, 149; Callaway Min. & Manuf'g Co.

v. Clark, 32 Mo. 305; Taylor v. Maguire, 12 Mo. 317; The Lively [Case No. 8,403]. To estimate her rental value upon her probable profits would be, in effect, to allow the owners of the Dove to recover those profits as damages. The Granite State, 3 Wall. [70 U. S.] 310; The Baltimore, 8 Wall. [75 U. S.] 386; The Blossom [Case No. 1,564]. The facts in the case of The Cayuga [supra] are very different from those proven in this case, and, whether rightly decided or not, it is no authority here.

LONGYEAR, District Judge. The most important of the exceptions, as well in amount as in the principles involved, are respondent's ninth exception, which is to the item allowed by the commissioner for demurrage, 28 days at $100 per day, $2,800, and respondent's eleventh exception, which is to the item allowed for value of services of steamer Eighth Ohio, 11 days at $100 per day, $1,100; and libellant's third exception relating to the latter item, which is that the commissioners reduced the claim for services for the steamer Eighth Ohio, it being claimed that a larger amount was actually paid. These exceptions will be first considered.

1. As to the item for demurrage. The River and Lake Shore Steamboat Line, the libellant corporation, was, among other things, running a line of steamboats between Detroit and Port Huron during the season of 1869, for carrying passengers and freight. The Dove was owned by libellant, and was running on that line, making daily trips from Detroit to Port Huron and back, at the time of the collision. The collision occurred on the night of the 31st day of May, 1869. The Dove was sunken by the collision, was raised and brought to Detroit, placed in dry dock and repaired, and resumed her place in the line and commenced running again on the 28th day of June. 1869. The time she was so detained from her regular trips was necessarily occupied in raising and repairing her. During her detention her place in the line was supplied by other boats belonging to libellant. Thus far there is no dispute as to the facts. Neither is it disputed as a proposition of law (and, in fact, the law in this regard is too well established to admit of question) that libellant is entitled to recover damages for the detention, or, as it is commonly called, demurrage. The question in dispute is as to the proper basis or measure of damages. On behalf of respondent it is contended that, in a case like the present, the rental or charter value alone is the proper basis, and because it appears by the evidence before the commissioner that at the port of Detroit, the home port of the Dove, there was no established rental or charter value of vessels like the Dove, and because it does not appear that she could have been chartered during the time of her detention, there is no basis for recovery of damages as demurrage;

and that the most that libellant can recover is interest on the value of the vessel during the detention.

On behalf of the libellants it is contended that, because there was no established rental or charter value by which to ascertain the damages for the detention, and, at all events, because libellant did not keep the Dove for hire, but for libellant's own use and service in the business and employment for which she was intended, and in which she was then engaged, the value of such use and service to libellant in that particular business and employment, under the maxim "Restitutio in integrum," always applied in such cases, is the proper basis and measure of damages for the detention; provided, of course, that such value is susceptible of proof, and is proven, to a reasonable certainty. In reply to this, it is contended, on behalf of respondent, that the proof of such value must of necessity be based, as it is in fact in this case, upon probable profits of such service during the detention; and that such basis is excluded by express authority.

To support the propositions contended for on behalf of respondent, the cases of Smith v. Condry, 1 How. [42 U. S.] 28, and Williamson v. Barrett, 13 How. 101, are cited. The first named case is cited as an express decision of the supreme court excluding future profits as a basis or measure of damages for demurrage, and the last named case as a like decision establishing and limiting the rule of damages in such cases to include the market rental or charter value only, and that where there is no such value established, there can be no damages for detention allowed. These cases have been sometimes misapprehended by learned commentators, and to some extent by the learned advocates on both sides in this case. Mr. Conkling (1 Adm. 384), and Mr. Parsons (1 Shipp. 540, note 1), both assume that Smith v. Condry (which was decided in 1843) decides that the probable profits of the earnings of the vessel during the detention are not allowable as demurrage; and that Williamson v. Barrett (which was decided in 1851) decides that such profits are allowable, and thus subverts the former decision and establishes a different rule. As we shall presently see, these are misapprehensions, and that in neither case was the decision what is thus assumed. The questions presented in the two cases were entirely different, and the decisions are in no manner in conflict with each other. What was decided in each case remains the law to-day, unimpaired and unqualified by any subsequent rulings of that court.

In Smith v. Condry, the vessel detained was laden with salt, and the damages claimed were for a loss or diminution of profits on the cargo, in consequence of a decline in the price of salt at the port of destination during the detention. The court held that such damages were not allowable, and that is all the court decided. Such damages were clearly speculative merely, and too remote. The decision of the court excluding such damages was in accordance with what I understand to have been the uniform course of decision of the courts in England and America, both before and since, and it is undoubtedly the law to-day. But the court made no decision in that case as to damages for the delay of the vessel—whether such damages are or are not allowable—nor whether the probable earnings of the vessel during her detention, by way of freights, hiring or otherwise, are or are not allowable. No such question was before the court, and no rule whatever was laid down as to it. All that the court decided was that probable profits on the cargo, which might have been made but for the delay, are not allowable. When the court say (chapter 35): "It is the actual damage sustained by the party at the time and place of the injury that is the measure of damages," they are speaking of the case before them—a claim for probable profits on the cargo—and not of the detention of the vessel and damages resulting from loss of her use and service as such. The case of Smith v. Condry [supra], therefore, does not reach the present question.

In Williamson v. Barrett [supra], the general question of damages for loss of the use of vessel during the detention, was directly before the court. That was an action at common law, for damages by collision on the Ohio river. On the trial in the circuit court the jury were instructed, among other things, to give damages for "the use of the boat during the time necessary to make the repairs and fit her for business." The evidence given to support this claim for damages is not stated, and it does not appear upon what basis the claim was made—whether for rental or charter value or otherwise. The supreme court, however, after reciting the instruction, say: "By the use of the boat, we understand what she would produce to the plaintiffs by the hiring or chartering of her to run upon the river in the business in which she had been usually engaged." The court then, after announcing the general rule regulating damages in cases of collision to be the allowance to the injured party of an indemnity to the extent of the loss sustained, and after some discussion in regard to the difficulty in stating the grounds upon which to arrive, in all cases, at the proper measure of that indemnity, and having arrived at the conclusion that the demand in the market for vessels of the description of the one disabled, and the price which the owner could obtain, or might have obtained, for her hire, are proper bases of compensation, proceed as follows: "If there is no demand for the employment, and of course no hire to be obtained, no compensation for the detention during the repairs will be allowed, as no loss would be sustained. But if it can be shown that the vessel might have been chartered during the

period of the repairs, it is impossible to deny that the owner has lost, in consequence of the damage, the amount which she might have thus earned. The market price, therefore, of the hire of the vessel, applied as a test of the value of the service will be, if not as certain as in the case where she is under a charter party, at least, so certain that, for all practical purposes in the administration of justice, no substantial distinction can be made." The point, and the only point actually decided in that case, is that damages for the detention are allowable, notwithstanding the vessel injured was not under a charter party at the time of the injury, provided it is shown that she might have been chartered during the detention. That is to say, that it is not indispensable to the recovery of damages for demurrage that the injured vessel should have been under a charter party at the time of the injury. What the court say in deciding this point, as to what is a proper measure or basis of damages in such a case, must be read and understood with reference to what they say they understood by the "use" of the boat, as that word was used in the charge to the jury, viz., "what she would produce to the plaintiffs by the hiring or chartering of her." What I understand the court to say is, that in that case, and under the general signification of the expression "use of the boat," as understood by them, a proper rule of damages is the rental or charter value of the vessel. I do not understand the court to lay this down as an inflexible and universal rule, applicable alike to all cases where the vessel injured is not actually under a charter party at the time of the collision. In fact, the contrary appears in the course of the opinion of the court. At page 111, the court cite approvingly the decision of Dr. Lushington in the case of The Gazelle, 2 W. Rob. Adm. 279, in which the freight the injured vessel was earning at the time of the collision, less the probable expenses in earning it, was adopted as the measure of damages for the detention. In citing this opinion, the supreme court remark: "This rule may afford a very fair indemnity in cases where the repairs are completed within the period usually occupied in the voyage in which the freight is to be earned. But if a longer period is required, it obviously falls short of an adequate allowance. Neither will it apply where the vessel is not engaged in earning freight at the time. The principle, however, governing the court in adopting the freight which the vessel was in the act of earning as a just measure of compensation in the case, is one of general application. It looks to the capacity of the vessel to earn freight for the benefit of the owner, and consequent loss sustained while deprived of her service. In other words, to the amount she would earn him on hire." And it was so understood (as not fixing an inflexible rule), by Mr. Justice Catron, in his dissenting opinion. On page 114, he says:

"The supposition that the amount of damages can be easily fixed, by proof of what the injured boat could have been hired for on a charter party, during her detention, will turn out to be a barren theory, as no general practice of chartering steamboats is known on the Western rivers, nor can it ever exist; the nature of the vessels and the contingencies of navigation being opposed to it. In most cases," he says, "the proof will be that the boat could not have found any one to hire her; and then the contending parties will be thrown on the contingency, whether she could have earned something, or nothing, little or much, in the hands of her owner during the time she was necessarily detained." Here the learned judge describes exactly the contingency which exists in the present case; and it is because the decision of the majority of the court is, in his opinion, capable of being extended to cover such a contingency, that he dissents.

The rule that the party injured is entitled to an adequate compensation for any loss he may sustain for the detention of the vessel, is fully recognized and broadly stated in the opinion of the court. But what would be the proper mode of arriving at such compensation, in cases where the vessel at the time of the injury was not earning freight, not under a charter party, and no demand for the hiring of vessels, and no use for them, except by the owner, and therefore no market rental or charter value (as in the present case), is not discussed or decided. The principle upon which compensation is awarded for marine torts, enunciated in this case as well as in others, especially in The Gazelle, 2 W. Rob. Adm. 279, The Clarence, 3 W. Rob. Adm. 283, and other English cases, is broad enough to cover all such cases as those above enumerated, and they are clearly not excluded by any rule laid down in Williamson v. Barrett, nor in any other case I have examined, and I have examined all the numerous cases cited in the briefs of counsel, and some others. If actual loss on account of the detention is made to appear, the case is within the principle, and damages are recoverable. It then only remains to prove the amount. In The Clarence, 3 W. Rob. Adm. 283, the whole doctrine is very clearly stated. In that case there was no proof of any actual loss, and the court (page 286) says: "In order to entitle a party to be indemnified for what is termed in this court a consequential loss, being for the detention of his vessel, two things are absolutely necessary—actual loss and reasonable proof of the amount. Both must be proved," &c. And again: "It does not follow, as a matter of necessity, that anything is due for the detention of a vessel whilst under repair. Under some circumstances, undoubtedly, such a consequence will follow, as for example, where a fishing voyage is lost, or where the vessel would have been beneficially employed." And again: "The onus of proving her loss rests with the plaintiff, and this onus has not been

discharged upon the present occasion. Had the owners of the Clarence proved that the vessel would have earned freight, and that such freight was lost by the collision, the case would have fallen within the principle to which I have last adverted." Under that rule, I think that the loss of earnings during detention is clearly allowable; and this, although not actually earning freight at the time of the injury, nor kept for hire, nor under a charter party, nor any market rental or charter value of vessels of like character, nor any demand for the hire of such vessels, provided it is proven to a reasonable certainty that the vessel would have been actually employed by the owner during such detention, and that she would actually have earned the owner something over and above her expenses. What is meant by this is, that such facts are competent as a basis of damages for detention. The difficulty is in making the requisite proof, both as to the fact of actual loss and of the amount. But more of that hereafter.

That the supreme court so understood the rule, and that no ultimatum was laid down in the case of Williamson v. Barrett, 13 How. [54 U. S.] 101, I think, appears with reasonable certainty by the opinion of that court in Sturgis v. Clough, 1 Wall. [68 U. S.] 269, by Justice Grier, in 1863. That was a case of collision. The injured vessel was detained fourteen days while undergoing repairs. The commissioner allowed demurrage on the 'naked opinions of witnesses as to what the vessel might have earned per day if engaged, unsupported by the exhibit of the owner's books, to show what she had actually made previously or afterwards. The district court disallowed the demurrage, and the supreme court sustained the decision. The district court did, however, allow something in consideration of demurrage, by way of confirming the commissioner's report as to the amount allowed for repairs, which the court regarded as too much, saying: "The result would be about just between the parties on the whole case." It appears that the injured vessel was a tug-boat used by her owners in towing vessels to and from sea, about the harbor of New York. In deciding the case, the supreme court (page 272) say: "The court did not decide that demurrage was not a proper item to be allowed in the computation of damages, but that the amount of his decree was a just allowance for all damages sustained by libellant." The force of this language will be understood by reference to the facts of the case in regard to which it was used, as above stated. And again: "On reviewing the evidence, we are satisfied that the sum allowed in the decree was 'just between the parties.' The report of the commissioner, allowing the whole bill for repairs, was not just, because the repairs necessarily made were chargeable not wholly to the collision, but to the age and previous condition of the boat. The charge for demur-

rage allowed by him was not justified by the evidence, although there was testimony to support it such as can always be obtained when friendly experts are called to give opinions." Thus recognizing that even such testimony as the opinions of experts as to the probable daily earnings of the vessel, in her common employment by her owner, is competent testimony, although not sufficient alone to justify the allowance. The court then, in the same connection, proceeds: "Besides, the libellant withheld the best evidence of the profits made by his boat, which would be found in his own books, showing his receipts and expenditures before the collision." Now, while this can hardly be given the force of a direct ruling upon the question, yet it is not mere dictum; and I think it is not claiming too much for it to say that it is a clear recognition of the doctrine that the probable net earnings of a vessel during detention, under circumstances very much like those of the present case, constitute a proper basis of damages for demurrage, and that the books of the owner showing the receipts and expenditures of the vessel before the collision are not only competent testimony, but constitute the best evidence as to the amount of such probable net earnings.

In the present case, the commissioner had before him not only the opinions of several competent experts as to the value of the services of the Dove to her owner per day, but the owner's books, from which trip sheets were made out and attached to the report, showing her daily receipts and expenditures during the month immediately preceding the collision, and the month immediately following the resumption of her trips. Besides the inference above drawn from Sturgis v. Clough, 1 Wall. [68 U. S.] 269, that the supreme court regards probable future earnings allowable as damage for detention in cases of marine tort, like the present, we have the positive opinion of Judge Leavitt, late of the Southern district of Ohio, in his charge to the jury in Jolly v. Terre Haute Drawbridge Co. [Case No. 7,441], and Judge Benedict, of the Eastern district of New York, in The Cayuga [Id. 2,535], and of Woodruff, Circuit Judge, in the same case [Id. 2,537], that such earnings do constitute a proper basis of damages in such cases. See also opinion by Justice Nelson, in The R. L. Mabey [Id. 11,871]. Such is clearly the rule in England, as has already been shown. See, also, Lown. Col. 154–156, and Shear. & R. Neg. § 599.

The subject of future profits, as a basis of damages in cases of tort, has undergone a vast amount of judicial discussion and decision in the law courts. A broad, if not well defined, distinction between actions ex contractu and actions ex delicto, is recognized in this regard, wherever it has been drawn in question. In actions ex delicto it is the almost, if not quite the unanimous voice of those courts, that such profits are recoverable

as damages. Not speculative and merely possible profits. Those are never allowed. In order to be recoverable, "its source must be ascertained and its extent defined, and its realization must appear to have been reasonably certain." And I am willing to go further, and say its source must be the direct and immediate use or service of the thing injured, or the prosecution of the business interrupted.

The numerous cases cited by counsel from the law courts have been examined by me, so far as within my reach. It would be extending this opinion to too great length to notice them in detail. I shall, therefore, content myself with a simple citation of some of the leading and more prominent cases: Lacour v. Mayor, etc., 3 Duer, 406; St. John v. Mayor, etc., 6 Duer, 315; Walter v. Post, Id. 363; Allison v. Chandler, 11 Mich. 542; Sewall's Falls Bridge v. Fisk, 23 N. H. (3 Fost.) 171; Griffin v. Colver, 16 N. Y. 489.

The question in this class of cases is, has the owner lost anything by the delay, and, if so, how much? The answer to this question determines the right of the owner to recover damages for the detention. And in a case like the present, where the vessel was not kept for hire, but was kept for the owner's own use, and where there was, in fact, no market rental value of vessels, and no demand for employment in that way, the answer to be given depends upon the answer to certain other questions: First, had the owner use or employment for his vessel during the detention? And, second, how much would she have earned in such use or employment? Under the evidence in the present case, the answer to the first question is not difficult. The Dove constituted one of a line of steamers on a certain route, and upon which she was actually employed at the time of the collision. The libellant corporation continued to occupy that route during the entire time of the detention, and the Dove resumed her place upon it after the detention. At the time of the collision, and, in fact, during the detention, the libellant had virtually a monopoly of the route for both freight and passengers, and the earnings of the Dove upon the route were profitable. Of that use and employment, and of these earnings the libellant corporation was deprived by the collision. As to these conclusions from the evidence there is no contest or dispute. Clearly, then, libellant is entitled to recover something on account of the detention. How much depends upon the answer to be given to the second question. How much would the Dove have earned in such use and employment, but for the detention? The solution of this question presents some difficulty; it borders so closely upon the boundary line between that which is certain and that which is uncertain, shadowy, contingent and speculative. That the Dove would have earned something over and above her expenses we have already seen. The difficulty exists in determining how much.

The certainty required is not absolute certainty, but reasonable certainty. In the first place, we have the opinions of several respectable boat and vessel owners, placing the value of the use of the Dove to her owner at sums varying from $110 to $130 per day. The opinions of witnesses, as we have seen in Sturgis v. Clough, supra, although competent testimony, are not sufficient alone to determine the amount.

But in the present case, the books of libellant were exhibited, showing the gross daily earnings of the Dove for the month of May immediately preceding, and for the month of July following the detention—testimony clearly recognized by the supreme court in Sturgis v. Clough, supra, as not only competent, but as the best evidence of the probable earnings of the vessel during the detention. And it is clearly the best evidence of which the case admits. In addition to this, the testimony shows that the month of June, during nearly the whole of which the Dove was detained, was the best month of the season. There is no conflicting testimony. It seems to me the testimony is sufficient from which the value of the use and services of the Dove, and the consequent damage to her owner by her detention, may be ascertained with reasonable certainty. I am free to admit, however, that the question is not free from difficulty, and some doubt. But the evidence given being the best the case affords, and being reasonably certain. I think strict justice requires that the party in fault should bear whatever inconvenience or hardship there may be arising out of the attendant difficulties and doubts. Dr. Lushington, in the case of The Gazelle, 2 W. Rob. Adm. 281, 284, in remarking upon the general question, with great clearness and justice, said: "The right against a wrong doer is for a restitutio in integrum, and this restitution he is bound to make without calling upon the party injured to assist him in any way whatsoever. If the settlement of the indemnification be attended with any difficulty (and in those cases difficulties must and will frequently occur), the party in fault must bear the inconvenience. He has no right to fix this inconvenience upon the injured party; and if that party derives incidentally a greater benefit than mere indemnification, it arises only from the impossibility of otherwise effecting such indemnification without exposing him to some loss or burden, which the law will not place upon him." It is true, this was said against a reduction of one-third new for old, as in insurance cases, in determining the amount due for repairs; but at page 284 the learned doctor expressly applies the same doctrine to demurrage.

The collision occurred on the night of the 31st day of May, and the Dove resumed her trips on the 28th day of June, 1869. The first nineteen days of May her trips were not daily, nor, in all cases, regular. She, in fact, made only five trips during that period. I think, therefore, that those trips must be ex-

cluded in arriving at her average daily earnings. During the last twelve days of May and the whole of July she made regular daily trips, except Sundays and the Fourth of July. She may have been, and probably was, employed on excursions on those days, but as nothing appears in the evidence with sufficient certainty to base any calculations upon as to these days, they must be treated as lay days, and excluded from the estimates. Excluding these lay days, then the Dove made eleven regular daily trips in May, and twenty-seven in July. Her gross earnings for the eleven days in May were $2,137.83, and her gross expenses for the period of time covered by these eleven days were $982.85, calculated on the basis of her gross expenses for the whole month, as proven. Her net earnings, therefore, for the eleven days in May were $1,154.98, and her average net earnings per day were $105. Her gross earnings for the twenty-seven days in July were $6,167.70, and her gross expenses for the whole month $3,179.88. Her net earnings, therefore, for the twenty-seven days in July were $2,987.82, and her average net earnings per day were $110.66. Looking at these results, and taking into consideration the opinions of the expert witnesses estimating the value of the use and services of the Dove to her owners at $110 to $130 per day, and the evidence that the period of her detention comprised a large portion of the most profitable part of the season, it clearly appears that the amount, $100 per day, fixed by the commissioner, is certainly not beyond, but, on the contrary, is entirely within the amount of the boat's probable net daily earnings during the time of her detention. I shall, therefore, not disturb his report in that respect.

But the able and usually accurate commissioner who made the report has committed two errors in regard to the number of days for which allowance for demurrage shall be made. In the first place, he has allowed for twenty-eight days when only twenty-seven intervened between the time of the collision and the resumption of her trips by the Dove; the collision having occurred on the night of May 31st, and the Dove having resumed on the 28th day of the following month. In the second place, no allowance was made for lay days. I think this allowance should be made, for the reason that the same proof upon which we base our conclusions as to the value of the boat's earnings, shows quite as clearly that Sundays were usually though not quite always, lay days. As four of these occurred during the twenty-seven days' detention, they must be deducted from the time. This is necessary to make the estimates as to time. and as to the amount of damages per day, consistent with the basis upon which both are established. And it is contrary to justice that the owner should receive pay for such days as it is reasonably certain. for anything the proofs show. the boat would have earned him nothing. Deducting the four days from

the twenty-seven days, leaves twenty-three days, for which the allowance must be made at $100 per day, making in all $2,300, instead of $2,800, as found by the commissioner; and his report must be modified accordingly. The difference $500, together with interest thereon, at the same rate, and for the same time allowed by the commissioner on the whole amount, must be deducted from the gross amount of the commissioner's report.

2. As to the allowance made for the services of the steamer Eighth Ohio. Both parties except as to this item; respondent claiming it is too high, and libellant claiming it is too low. There is no dispute as to the fact of the service being rendered, its necessity, and as to the length of time. The only dispute is as to the amount. The steamer belonged to libellant. She was hired by the underwriters, and was used by them as a wrecking vessel in raising the Dove. She was so used in running of errands, boarding and lodging the men, and tugging. The price agreed to be paid was $140 per day, and that amount was paid, and allowed in the adjustment. Libellant claims that the price was agreed on and paid in good faith, and that the whole amount ought to be allowed. Respondent claims that a lower priced boat might have been obtained which would have answered just as well, by reasonable diligence; that the amount was unreasonable, because there was no crew hired with her, or if hired, it was unnecessary, as the crew of the Dove could have been used on her; and that at all events the crew of the Dove was in fact so used to some extent. The commissioner reduced the amount from $140 per day, as claimed, to $100 per day, and fixed the allowance on that basis. The testimony appears to be somewhat conflicting, and, as it comes to me, the preponderance is not palpable. The commissioner had the witnesses all before him, and heard their testimony, and no doubt gave it careful consideration. Under these circumstances, the safer rule appears to be, not to disturb the finding of the commissioner, and such I believe to be the usual practice. See Egbert v. Baltimore & O. R. Co. [Case No. 4,305]; Holmes v. Dodge [Id. 6,637]. The exceptions to this item are therefore overruled.

3. As to the remaining exceptions. * * * Libellant's second exception is to the disallowance of the sum of $100, paid Joseph Nicholson. However valuable Nicholson's aid may have been to libellant in the settlement and payment of bills—and I have no doubt it was valuable—I fail to see its necessity, and I think it is too remote to be charged as a necessary consequence of the collision. I therefore consider the disallowance correct. * * * Respondent's eighth exception is to damage to cornice, head lines and frescoes, $300. This allowance was made solely upon the estimate of Captain Sloan, master of the Dove, and who had charge of the repairs generally. Estimates of this kind are allowed and acted on in cases where the repairs have

not been made at the time of the assessment, but never, I believe, where the repairs have been actually made. Where the repairs have been made, I believe it to be the invariable rule—at all events, I am clear that it ought to be—to adopt the actual cost of the repairs as the measure of damages. The actual cost admits of certainty of proof, while estimates depend upon the mere opinions of witnesses which may or may not be correct. In this case, the cabin, in which this item of damage is alleged to have been done was repaired, and it does not appear what these particular repairs cost, separately from the general repairs. Under the rule above stated, there is therefore no basis on which to make the allowance.

The remaining exceptions involve merely questions of fact and are not reported.

[NOTE. From the decree of the district court an appeal was taken by the owners of the Mayflower to the circuit court, where the decree was affirmed (case unreported). Subsequently an appeal was taken to the supreme court, where the decree of the circuit court was affirmed. 91 U. S. 381.]